May it please the Court, my name is Daryl Cochran. I'm here on behalf of the appellant, Warren Wisnant. We're appealing an order which was entered on a 12b6 motion by Judge Burgess down in Tacoma. B6 or B1? B1. Pardon me. 12b, I should have said. Motion to dismiss, and it's based on subject matter jurisdiction. Discretionary immunity exception to the Federal Tort Claims Act is the basis for his ruling. I'll not be addressing any arguments about the procedural issue, whether he fairly interpreted our facts or gave us the light most favorable. Our point is simply that he fundamentally misunderstood the scope and reach of the discretionary immunity exception. Well, did the government have discretion to maintain a morally unhealthy meat department? I don't believe that they did. In fact, the Defense Commissary Agency's Directive 3017 says you're supposed to maintain a healthful work environment and you're supposed to promptly investigate. And that is the crux of the negligence on the part of the United States, is that they had people literally dropping like flies in the commissary after they had noticed that there were mold problems and they failed to react. And that's the basis. That's at least one basis for negligence. The defense's argument is, in particular in its briefing in front of the district court, was there's this Fourth Circuit case, Williams or United States v. Williams, that you should in a slip and fall case, not unlike the one that you just heard about, that there's discretionary immunity. And I submit that the Ninth Circuit will not be adopting interpretation of discretionary immunity that the Fourth Circuit has. If that were to be the case, then the Federal Tort Claims Act would be eviscerated by the exception. In fact, in U.S. v. Gobert, Justice Scalia, and this is momentous for me to side with Justice Scalia, but he said that there are certainly cases that are not of the nature and quality of conduct which the discretionary immunity shields. And he gave an absurd example. For example, a high-ranking official who comes out of a regulatory meeting gets in his government vehicle in the scope of his duties and collides with a car. And Justice Scalia said that is absolutely what the Federal Tort Claims Act sought to preserve to people or give to people to sue against the State. And he said a clever lawyer could make the argument that someone driving constantly uses discretion in whether they're yielding and merging into traffic, that a clever lawyer could even say, but the high-ranking official was thinking of regulatory issues and became distracted and therefore collided. And there are a litany of other reasons why we could say that that was discretionary. But he said absolutely not, because that's not the nature and quality of the conduct that the Federal Tort Claims Act is seeking to exclude. This is a premises liability case. We have a man who entered a grocery store who was injured by conditions there that were caused negligently, and that is fundamentally what the Federal Tort Claims Act sought to give to the people. It is not one of the regulatory agency decisions which the If we look at Goebert, and I'll pronounce it Goebert because I've never found a phonetical spelling otherwise, we're talking about a regulatory decision, a regulatory agency exercising its dominion over failing savings and loans. And the Federal Tort Claims Act, during all of the historical discussions, said that's precisely what we want to protect, because you can't go to your local superior court down in Tacoma and file a suit because there is no such suit like that. We're not going to sue the Federal Aviation Administration when it comes up with a backup safety protocol for the industry, because we want to make sure that our government provides that regulatory protection for all of us. But what the Federal Tort Claims Act did carve out for the people to sue is when the government is going to take on things that we experience in our daily lives, like operating a grocery, which the commissary is, that you've got to comply with basically the local standards. And there can be no dispute that if our client, Warren Wisnant, was suing the Piggly Wiggly store down in Tacoma for this same injury that he suffered, that he would have a lawsuit in superior court. And that's what the Tort Claims Act says, is if you have a negligence suit, an ordinary garden variety negligence suit, that you should be allowed to bring that against the government. So that's the basic position. There's a case which we should have cited and should have briefed a little bit from your court. It's called the ARA Leisure Services, Incorporated v. The United States, and it's 831 Federal 2nd. When I begin on to a gum sheet that the clerk will give you and when you've completed your argument and give it to counsel and copies for us. Great. Thanks, Judge Fletcher. And the reason why that we should have is because it is a case, a 1987 case, before Gobert, but it is – it dealt with a bus that happened in the Denali National Park up in Alaska. And the question, the lawsuit was brought against the Park Services for failed maintenance and failed design of the road that contributed to the accident. And this court said that we're going to give discretionary immunity to the decision about how to design a road, because there was an allegation that the United States failed to design it, should have designed it with guardrails immediately. And they said, well, there was a policy decision made that said, we don't – we want to preserve the aesthetics and preserve the naturalness of the park, and therefore, we were not going to design it the way that the plaintiffs later wanted. But they said, as far as maintenance goes, and notice that this road was deteriorating, that is clearly outside of discretionary immunity. That is a function that we see – that can be brought locally all the time for negligent road maintenance. And that's very We're not talking about a regulatory decision of any kind. We're not – we're not suing OSHA for not having mold regulations in place. We're suing a grocery store because they did not react to notice that there were problems there. And literally, the notice was people were coming in and passing out, and the grocery store had notice of a mold problem. So that's – that's it. And I won't waste the Court unless you want me to pursue the Fourth Circuit line of analysis that the defense is going to come up with. Well, do you have any questions for Judge King? Any questions? I'll save the time for that. The panel understands the arguments from the briefing. Great. Thank you, Your Honor. Thank you. Ms. Bain, welcome, and please proceed. Thank you, Your Honor. Good morning. May it please the Court, my name is Quinn Bain, and I represent the United States in this case. This case is an attempt to second-guess the policy choices that agency personnel made in the course of carrying out the agency's occupational health and safety program at the Navy Base Commissary. The Supreme Court and this Court have held on a number of occasions that the kind of policy choices that agency personnel made in this case is the kind of policy choices that the discretionary exception – discretionary function exception is designed to protect. Well, what's the policy choice if there's mold? If there's mold and there's been – there have been complaints about it, what's the policy choice about whether it's corrected or not? Your Honor, we submit that in this case the government's activities satisfy the second prong of the discretionary function analysis because it is susceptible to policy changes in the course of carrying out the agency's occupational health and safety at the commissary, the need to identify and address hazards, the need to prevent accidents and injuries, and the need to promote cleanliness and safety and efficiency as balanced against a number of competing considerations such as cost, limited funding. Are you saying to us that on the basis of cost you can maintain unhealthy conditions? Your Honor, first of all, we submit that there was not an unhealthy condition at the commissary. Well, that's an argument you can make, but you can't make the argument that on the basis of cost you can maintain unhealthy conditions that make people sick and you know it. That's not our argument, Your Honor. With all due respect, we are not contending that cost is the sole justification for not conducting more frequent inspections as appellant would like the government to do in this case or to have done in this case, or that cost is the only justification for the government not prioritizing mold as a hazard. I'd like to take a minute and in addressing your question, in answering your question, talk about the hazard abatement activity that was carried out in this case because I believe that it is the heart of the case. The government's hazard abatement program at the commissary requires agency personnel to identify and address particular hazards. They have discretion in doing so. When mold was discovered inside the meat-cutting room wall cavities in the fall of 2000, there was no regulation, statute, or policy that specifically dictated how agency personnel were to handle mold as a perceived hazard. Agency personnel were not required to look for mold in the course of carrying out their inspections, investigations, hazard abatement program because mold was not considered an occupational health and safety hazard. Mold was not at the time, and I don't believe it is now, a regulated indoor air contaminant. It was not. So in prioritizing the hazards that the commissary addressed, agency personnel chose to deal with the more obvious, more real hazards first. And the record contains numerous examples of where agency personnel chose to deal with obvious hazards such as fixing a broken eyewash, fixing loose receptacles, repairing exposed electrical wiring and outlets, broken doorsteps. They also conducted regular inspections to make sure that agency personnel, the commissary workers, were complying with safety standards and had not, by their conduct, created any unsafe work conditions. In your record, when did the government first have notice that people thought that there was a problem with mold? Your Honor, the record shows that the government first became aware of the mold that was found inside the wall cavities in the meat-cutting room in the fall of 2000. What happened was the safety manager of the commissary conducted his monthly spot check inspection, which he was required to do under the regulation, and in the course of conducting that inspection, he came across, he noticed a bulge that was coming out of one of the aluminum panels in the meat-cutting room. He decided to take a further look, and he called in the Navy base's maintenance contractor, Johnson Controls, to peel back the wall panels and take a look inside, and what they found at that time was that the interior structures of the walls had been damaged by mold contamination. That is not to say, in this case, that the mold was obvious and visible as appellant contents, and I submit that I'd like to address opposing ---- When they discovered that. The government immediately hired a contractor to abate the mold, and the mold was abated within a matter of three weeks, and the repairs of the damaged wall structures were completed within three months' time, and there has not been a problem since then. When was the first warning or telling the government that they thought people were being made ill by the conditions there? Contrary to appellant's contention, people were not dropping like flies at the commissary because of mold exposure. Don't editorialize. Just answer the questions. Yes, Your Honor. I'm trying to get the time sequence. Right. Appellant contends that there were three instances prior to the fall of 2000 when the mold was found inside the wall cavities that government inspectors conducting food safety inspections had noticed traces of mold at various locations inside the commissary, and what they did, in fact, was to have the mold removed. They wiped it up, and they took care of the problem. I refer, Your Honor, to pages 16, 22, and 26 of the excerpts of record, indicating that as soon as the mold was found and identified as a perceived or potential food safety hazard, commissary personnel took care of the problem. They removed the mold. The record does not show that there was such an endemic mold problem or mold epidemic at the commissary, as counsel would have the court believe, and that the mold that was found consisted of three isolated instances of mold simply developing in the commissary. Mold is ubiquitous. It is a naturally existing condition. It exists in the environment and has existed for millions of years. Would those arguments, though, go to the issue of whether there was negligence or not as opposed or negligence that caused some damage, as opposed to whether there's a discretionary function exception to jurisdiction? That's correct, Your Honor. But to the extent that appellant is arguing that the government's discretionary activities in this case were just ordinary run-of-the-mill torts because they could not have been based on any permissible policy judgments, we respectfully disagree in carrying out the policy objectives of safety and occupational health and safety at the commissary. Government personnel had to weigh a number of competing policy interests. They had to take into consideration, on the one hand, the need to maintain a safe and clean environment at the commissary, the need to identify and abate hazards, the need to promote cleanliness and efficiency, and weigh those considerations against not only cost, staffing, resources, and funding, but also other programs that competed for the agency's resources, such as the need to provide safety training and education. We submit that it was the balancing of those competing policy interests that brings the government's activities in this case within the discretionary function exception. Counsel, this is a case where the merits and the jurisdiction seem to be intertwined. Negligence, which is the merits issue, is not relevant to the inquiry as to whether the government's activities are protected by a sovereign immunity, which is embodied in the discretionary function exception. The two kinds of inquiries are clearly separate. But what they're trying to say to us is because of the priorities that the government established, they didn't find them all. I mean, that's essentially what you're saying to us, that they would have found it sooner if they'd exercised their discretion to come in and look closer, oftener. Your Honor, we submit that the agency had to prioritize its resources, and in doing so, it had to prioritize the hazard abatement projects that it undertook. There were simply other, more obvious real hazards to address first. And mold was not a regulated indoor air contaminant, unlike radon or carbon monoxide or carbon dioxide, which scientific studies have proven at high levels can present a real threat to human health. Mold was not categorized as such a kind of health hazard. If the Court permits, I see that I'm out of time. I'd like to address your question about jurisdiction. We'll add some time. As long as judges are hammering you with questions, we'll give you extra time to respond. Thank you. I appreciate that. The Prescott case requires the government in this circuit to show that the discretionary function exception applies. And we submit that we have met that burden. We submit that government's activities were discretionary in nature and were susceptible to policy analysis. And in making that inquiry, the government had to produce certain jurisdictional facts, as did the appellant, to assist the Court in making that, in deciding the discretionary function's applicability. However, that is not to say that the jurisdictional facts are intertwined with the negligence facts. They are not. And we submit that under the standard of Prescott, the government has met its burden, but that under any other standard, the government has also satisfied its burden as well. If the Court has no further questions, we request permission. No further questions. Thank you, Ms. Payne. Thank you very much. We appreciate your argument. Mr. Cochran. Thank you, Your Honor. I wanted to address the policy issue, which was addressed there at the very end. That's precisely what Justice Scalia was talking about, his concurring opinion in Gobert, is that you can always make an argument that there was somehow with the government some policy decision-making at a higher level. And his motor vehicle accident example was perfect, because he said there the government can make the argument that they wanted the high-ranking official to be traveling quickly because he needed to get to the United Nations to make an argument. And he said you can always suggest that there is a political policy reason or an economic or a social reason why they did something that they did wrong, but that's not what the Tort Claims Act allows for. And your case, and that's why I brought that up, was the ARA Leisure Services case, the Denali Park case, addressed that budgetary issue, for example, about prioritizing. They said that if you have a duty to maintain a road just like you would in a local jurisdiction, you can make all the policy arguments you want, but the Federal Tort Claims Act has carved that out for people to sue on. And that's exactly the same case here. And, Judge Fletcher, you were asking about, you know, what facts were considered by the district court judge. And, you know, we were 12 feet out of it very early, so very little facts were developed. But the facts that we do have show that there was a reason to know of a mold problem which was causing it, presenting a toxic situation for people in the commissary in 1997. In 1997. And because this is a garden variety negligence case, we'll be using local law to establish that the commissary had the same duty as a local grocer, and they had the duty to use reasonable care, and that reasonable care required them to respond to potentially dangerous situations like the notice of mold and like the notice and observation of the fact that people are becoming sick for seemingly no reason inside of their commissary. And I've been litigating mold cases for about a decade, so the issue of mold is around the fact that OSHA hadn't set standards. It's a dispositive of nothing. OSHA is a reactive body which sets minimum standards. The standard which the commissary will be required to meet is the standard of a reasonable grocer. And you had evidence they had not met that standard? Correct, Your Honor. In fact, we submitted expert declarations from two experts who said that they have failed to meet the standard of reasonable care as it was back in 1997 through the point of our injury, which was the year 2000. Are there no other questions? We thank Mr. Cochran. Wisnant v. United States is submitted. We thank both counsel for their travels and their fine arguments. And Ms. Bain, have a nice flight back and have a nice drive back. Thank you, Your Honor. Thank you both. We will take a brief recess for about 15 minutes, 10 to 15 minutes. And after the recess, we will proceed with argument in two more cases, Ottery v. United States and
judges: B. Fletcher, Gould, King